422 So.2d 737 (1982)
Connie Ray EVANS
v.
STATE of Mississippi.
No. 53754.
Supreme Court of Mississippi.
November 3, 1982.
Rehearing Denied December 15, 1982.
*738 Bell & Collins, James D. Bell, Jackson, for appellant.
*739 Bill Allain, Atty. Gen. by Amy D. Whitten, Sp. Asst. Atty. Gen., Jackson, for appellee.
En banc.
ROY NOBLE LEE, Justice, for the Court:
Connie Ray Evans and Alfonso Artis were jointly indicted in the Circuit Court of the First Judicial District of Hinds County, Honorable William F. Coleman, presiding, on a charge of capital murder. Evans entered a plea of guilty to the charge and the trial proceeded on the sentencing phase. After hearing the evidence, the jury found Evans guilty and sentenced him to death. He has appealed and assigns ten (10) errors in the trial below.

FACTS
Connie Ray Evans was twenty-one (21) years of age at the time of the homicide. On the night of April 7, 1981, he and Alfonso Artis, age twenty-four (24), met at the Alamo Theater on Farish Street in the City of Jackson, Mississippi, and planned to rob R.J.'s Food Center on Lynch Street. They considered the fact that gunplay might be involved in the robbery. About 6:30 the following morning, Artis went to the house where Evans lived with his mother and stepfather, and they left together for the R.J. Food Center. Upon arrival there, they walked by the store on two occasions but did not enter because customers were present. After waiting approximately one-half hour, they began the robbery. Artis went inside with a gun while Evans waited outside and watched for trouble. Artis drew the gun on Arun Pahwa, the store attendant, and forced him at gunpoint to get on his knees behind the counter. Evans entered the store, received the gun from Artis, held it on Pahwa and guarded him while Artis checked the cash register. Artis could not open the cash drawer, and Pahwa was made to get up from the floor, open the cash register and then was forced to kneel again. Artis collected money from the cash register and then searched and emptied Pahwa's pockets and wallet.
Evans shot Pahwa in the head as he knelt motionless behind the counter and the two ran out the door. They had obtained approximately one hundred forty dollars ($140.00) in the robbery. Artis took off his shirt and wrapped the gun in it as they ran. Later, he gave the gun to Evans, who wiped away some of the fingerprints, and they hitchhiked to appellant's brother's house where Evans hid the gun behind a clock. They left there, caught a bus to the downtown area, and spent most of the money on new clothes. That night, they went to a movie, drank beer at a local club, then separated and went home. Evans told Artis that he shot Pahwa because "I was cold hearted."
The police were notified of the robbery and murder and went to the scene where they found the cash drawer open and Pahwa lying behind the counter in a pool of blood. The cause of death was a gunshot wound in the head. As a result of the police investigation, Artis was apprehended on the night of April 8, 1981, and Evans was arrested seventeen (17) days later on April 25, 1981. He stayed on the streets during this time and finally telephoned his mother and decided to give himself up. Evans gave a written confession to the crime. Artis pled guilty to charges of armed robbery and manslaughter and received a sentence of twenty (20) years, with fifteen (15) years suspended. He testified for the State on the trial.

LAW

I.

Did the trial court err in striking for cause a juror who was irrevocably committed to vote against the death penalty regardless of the facts and circumstances presented?
On voir dire examination, a female juror stated that she had conscientious scruples against the infliction of the death penalty; and that she had strong feelings about sending somebody to jail or giving them the death penalty. She said:

*740 Q. I would assume that the lesser of the two would be to send someone to jail, so are you sure that you couldn't sentence someone to death?
A. I am positive.
Q. You are positive you couldn't return a verdict recommending the death penalty, is that correct?
A. Yes, sir.
The prospective juror qualified her feeling against the death penalty by saying that, if a person had killed several people she probably could vote for the death penalty. Also, she vacillated some when interrogated by the appellant's attorney. She responded further:
Q. I see. So a murder in the process of a robbery you could not vote for the death penalty under any circumstances, is that correct?
A. (Juror nodded)
* * * * * *
Q. No question in your mind about that? You could not follow the law if the law was that you are to consider the death penalty and you decide on whether or not it's a bad enough case, and you couldn't even consider it if it was just one person killed?
A. If someone killed someone else, like I said, out of fear because they had robbed a store, no.
Q. I'm not asking you in self-defense or anything like that. Self-defense we wouldn't be here. He wouldn't have pled guilty.
A. (Juror nodded negatively).
Q. Your answer is still no, you could not consider it?
A. (Juror nodded negatively).
Q. Under any circumstances?
A. (Juror nodded).
The principle involved here was stated in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). It has been followed many times, and recently in Edwards v. State, 413 So.2d 1007 (Miss. 1982), where the Court said:
First argument made relates to the exclusion of juror Hibler on the ground of "conscientious scruples" against the death penalty. Juror Hibler was asked by the circuit judge if she could follow the testimony and instructions of the court although the "verdict could result in the death penalty"; juror Hibler said, "I couldn't."
Upon this state of juror Hibler's voir dire examination, she was excused and the defendant urges reversible error under Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Having categorically stated that she couldn't follow the testimony and instructions of the court, we think that the juror was correctly excluded. The fact that upon questioning by defense counsel, Hibler stated she would try to be a "fair" juror did not qualify her in this case. Similar argument was made in Edwards v. State, supra, n. 1, but there the sentence was life imprisonment whereas here the sentence is death. Thus, the two cases are not precisely analogous. For an excellent explanation of the proper method of bringing the death penalty to the attention of the special venire in capital cases, see Armstrong v. State, 214 So.2d 589 (Miss. 1968). [413 So.2d at 1009].
See also Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1969); Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969); Maxwell v. Bishop, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970).
In Irving v. State, 361 So.2d 1360 (Miss. 1978), we said:
Following Witherspoon, this Court considered the procedure to be employed by trial judges in Myers v. State, 254 So.2d 891 (Miss. 1971). That procedure follows:
"`The proper method of bringing the death penalty to the attention of the special veniremen is for the trial judge to inform them that they have been summoned as veniremen in a capital case and that a verdict of guilty could result in the infliction of the death penalty. The judge should then ask *741 them if any member of the panel has any conscientious scruples against the infliction of the death penalty, when the law authorizes it, in proper cases, and where the testimony warrants it. If there are those who say that they are opposed to the death penalty, the trial judge should then go further and ask those veniremen, who have answered in the affirmative, whether or not they could, nevertheless, follow the testimony and the instructions of the court and return a verdict of guilty although that verdict could result in the death penalty, if they, being the judges of the weight and worth of the evidence, were convinced of the guilt of the defendant and the circumstances warranted such a verdict. Those who say that they could follow the evidence and the instructions of the court should be retained, and those who cannot follow the instructions of the court should be released. The mere fact that a venireman is opposed to the death penalty does not disqualify him as a juryman, if he can do his duty as a citizen and juror and follow the instructions of the court, and where he is convinced of the defendant's guilt he can convict him although the verdict of the jury may result in the death penalty's being inflicted upon the defendant.' (Emphasis added). Armstrong v. State, Miss., 214 So.2d 589, at 593." 254 So.2d at 893-894. [361 So.2d at 1360].
We are of the opinion that there is no merit in the first assignment.

II.

Did the lower court err in admitting evidence of appellant's non-violent criminal record as proof that the capital murder was "committed by a person under sentence of imprisonment," pursuant to Mississippi Code Annotated § 99-19-101(5)(a) (Supp. 1982)?
The appellant contends that when an accused receives a suspended sentence for a non-violent crime, such sentence may not be subsequently used in a capital murder trial to prove that, as an aggravating circumstance, the murder was "committed by one under sentence of imprisonment." He relies upon Peek v. State, 395 So.2d 492 (Fla. 1980), wherein the Florida Supreme Court held that a defendant's probationary status was not a sentence of imprisonment, which would support Subsection (5)(a) of the statute. However, in Peek the death sentence was upheld on appeal in spite of the court's determination that a probated sentence had been erroneously included as an aggravating circumstance. The Florida Court said:
Thus, we have two clearly valid aggravating circumstances, one contested but valid aggravating circumstance, and no mitigating circumstances. We find that the trial court's improper consideration of the two aggravating circumstances concerning pecuniary gain and commission of the offense while on probation does not render the sentence invalid. Hargrave v. State, 366 So.2d 1 (Fla. 1978); Elledge v. State, 346 So.2d 998 (Fla. 1977). [395 So.2d at 499-500].
Subsequent to Peek v. State, the Florida Court said in Lewis v. State, 398 So.2d 432 (Fla. 1981):
The finding that appellant committed the capital felony while under a sentence of imprisonment was based on the fact that he was on parole from a prison sentence at the time of the murder. Based on evidence of this fact, we approve the court's finding of this aggravating circumstance. [398 So.2d at 438].
In Dobbert v. State, 375 So.2d 1069 (Fla. 1979), cert. den. 447 U.S. 912, 100 S.Ct. 3000, 64 L.Ed.2d 862, reh. den. 448 U.S. 916, 101 S.Ct. 37, 65 L.Ed.2d 1179, the Florida Court held, and the United States Supreme Court denied certiorari, that:
Although two aggravating circumstances were improperly determined to exist, we conclude that the trial court properly found that the murder was committed to avoid lawful arrest and was especially heinous and cruel... .
* * * * * *

*742 ... The evidence is not such as would require the trial court to find any of the mitigating circumstances proposed by Dobbert as a matter of law. Since there are one or more validly found aggravating circumstances and no mitigating circumstances, a reversal of the death sentence is not necessarily required. Elledge v. State, 346 So.2d 998 (Fla. 1977); Hargrave v. State, 366 So.2d 1 (Fla. 1978). [375 So.2d at 1070, 1071].
Jackson v. State, 381 So.2d 1040 (Miss. 1980), involved an appeal from an enhanced sentence where it was contended that the statute required that a defendant actually serve the sentence through physical incarceration (Jackson's prior sentence had been suspended). We held the following:
Jackson argues the conjunctive phrasing "and who shall have been sentenced ..." evidences a legislative intent to include within the class of habitual offenders only those who have been twice convicted of distinct felonies for which penitentiary terms have not only been pronounced as punishment, but also served through actual incarceration. We reject this argument, because we think the statutory intention is satisfied where, as here, the accused has been twice previously adjudged guilty of distinct felonies upon which sentences of one year or more have been pronounced, irrespective of subsequent probation or suspension of the sentences.
We are of the opinion the statute is intended to cure the evil of recidivism. Enhanced punishment relates to the conduct underlying the previous convictions. Adjudication of guilt and consequent pronouncements of sentences merely accord those convictions finality. Subsequent suspension of the sentences or probation is a matter of grace only, arising from the hope that the prospects of rehabilitation of the guilty warrant leniency. Clearly that hope is defeated when the beneficiary of the indulgence perpetuates further felonies. The statute is suited precisely to this problem. [381 So.2d at 1042].
We are of the opinion that, under Mississippi statutes and decisions, when a person has been convicted and placed on probation, particularly here, where four (4) years of a five-year sentence were suspended, such sentence is a sentence under imprisonment. Even so, there were other aggravating circumstances in the present case, and, under the Florida decisions, they were sufficient to sustain the conviction.

III.

Did the trial court err in admitting into evidence at the sentencing phase of a death penalty case, proof of matters admitted by the defendant by his plea of guilty in open court, where such proof was not related to the aggravating circumstances set forth in Mississippi Code Annotated § 99-19-101 (1972)?
Appellant argues that certain evidence and exhibits introduced were erroneous and prejudicial since he pled guilty to the robbery-murder and that proof should have been limited to matters not admitted in his guilty plea. An orderly and coherent procedure in the sentencing phase requires proof of the manner in which the homicide was committed. Facts relevant to an aggravating circumstance are competent. The statute sets forth eight (8) aggravating circumstances, any one, or more, of which may be proved. The State introduced nine (9) color photographs showing the body of the victim and the scene of the crime. Appellant contends that they were inflammatory and, since he had admitted the homicide, were not relevant in the sentencing phase.
Slides 1 and 2 show the cash register and the open cash drawer found by the police shortly after the robbery-murder. Slices 3 through 9 show the body of the victim and the surrounding store area. We think that the slides were competent and relevant on the issues of whether or not (1) the capital offense was committed while the appellant was engaged in the commission of robbery, and (2) the capital offense was committed for the purpose of avoiding or preventing lawful arrest, and (3) the capital offense was especially heinous, atrocious or *743 cruel. In Coleman v. State, 378 So.2d 640 (Miss. 1978), the Court had for consideration two (2) color photographs showing where shotgun pellets hit the victim on the right side of the head, lower arm and left side of his chest. The Court held that they were competent and had probative value on the aggravating circumstance of especially heinous, atrocious or cruel.
We have examined the opinions in Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) and Jordan v. Watkins, 681 F.2d 1067 (5th Cir.1982),[1] which discussed the phrase in an aggravating circumstance "outrageous or wantonly vile, horrible or inhuman in that they involved ... depravity of mind... ." (Georgia) and "was especially heinous, atrocius or cruel." (Mississippi). The decision of the Georgia Supreme Court in Godfrey was reversed, the United States Supreme Court holding that the Georgia court did not apply a proper constitutional construction of the phrase. Jordan was reversed, following Godfrey, on the ground that in Jackson v. State, 337 So.2d 1242, 1250 (Miss. 1976), the Mississippi Supreme Court gave no proper guidance to the jury for imposition of the death penalty on that aggravating circumstance.[2]
In the case sub judice, the victim was forced to kneel on the floor behind the counter with a .38-caliber revolver pointing at his head, he was made to stand up at gunpoint and open the cash register, and again was forced to kneel on the floor with the revolver still pointing at his head. He was physically assaulted by one of the robbers emptying his pockets, all occurring over a short period of time. From those facts, the jury could consider mental torture and aggravation which the victim probably underwent, and to determine whether or not the murder under all the facts and circumstances was especially heinous, atrocious or cruel. Even though it may be said that the facts of the homicide do not pass constitutional muster on the aggravating circumstance of being especially heinous, atrocious or cruel, three (3) other aggravating circumstances were proved by overwhelming evidence.
Dr. Baldev Pahwa, brother of the deceased, testified for the State and identified his deceased's brother from one of the photographs. The witness was emotional and sobbed on the witness stand.[3] The appellant argues that the testimony was calculated to inflame the jury more than the pictures introduced. We are unable to say that his testimony was not relevant and did not have probative value. It was for the purpose of identifying the victim and, as we have said in other cases, the appellant caused the situation and cannot complain, if the evidence has probative value.
Appellant next contends the court should have stricken from the appellant's confession (1) that part setting forth he and Artis planned to rob the food store and possibly slay the store clerk, (2) that he saw "Alfonso behind the counter pointing the gun at the man who was down on the floor on his knees," (3) that part relating to what appellant and Artis did following the murder, (4) that part stating it was his idea to rob R.J.'s Food Center, and (5) that part to the effect that he shot the man because "The man knew me and I did not want him to identify me."
We think that the entire confession was properly admitted in evidence. It was a part of the orderly presentation of the State's case and was relevant on the issues of aggravating circumstances submitted to the jury.

IV.

Did the lower court err in overruling the motion for mistrial when a witness testified *744 that the victim's pregnant wife appeared at the scene of the crime shortly after it occurred?
Officer Willie Allen testified for the State, and during his testimony, the following question and answer was asked and given:
Q. And at the time you arrived there, other than the deceased, was there anyone else connected with R.J.'s Food Center there that you observed?
A. Okay. After getting the information from some of the witnesses that were working across the street, the family came, his wife and she was about seven or eight months pregnant and his mother and father 
The answer was not responsive to the question. Appellant's attorney objected on the ground that the wife's pregnancy unknown to the appellant prior to the homicide, had no relevancy to the aggravating circumstances and was prejudicial to the defendant. The trial judge sustained the objection in chambers, and asked appellant's attorney, if he desired him to instruct the jury to disregard the statement. The attorney argued for a mistrial, which was denied, and then told the trial judge he had no alternative except to request the jury be instructed to disregard the statement.
Each juror said that he (she) would disregard the statement. The jury is presumed to have followed the directions of the judge. There was no error under Hughes v. State, 376 So.2d 1349 (Miss. 1979); Gray v. State, 375 So.2d 994 (Miss. 1979); and Duke v. State, 340 So.2d 727 (Miss. 1976).
Further, the court instructed the jury in Instruction No. 1 to "disregard all evidence which was excluded by the court from consideration during the course of the trial."

V.

Did the lower court err in permitting a witness to testify that the appellant said he killed the victim because he was "cold hearted?"
Alfonso Artis, the accomplice, testified that he asked appellant why he shot Mr. Pahwa, and appellant replied, "I was cold hearted." Appellant testified on the trial that "I didn't mean to do it and I'm sorry." The statement he made to Artis soon after the homicide was relevant on the issue of aggravating circumstances.
In Washington v. State, 361 So.2d 61 (Miss. 1978), the facts were similar to those here. There, the defendant struck the victim over the head with a shotgun, had obtained the money and was backing out of the store when he shot the victim in the stomach with the shotgun. The testimony here shows that, as in Washington, he could have fled without cold-heartedly killing the proprietor of the store.

VI.

Did the lower court err in permitting the prosecution to cross-examine the defendant's mother about his prior juvenile record?
During the defense's direct questioning of appellant's mother, Mary Lewis, the following occurred:
Q. Why did he not finish the tenth grade?
A. Well, Connie, he stopped to look for work and he would get odd jobs, you know, in order to help me and he would cut yards or whatever he could find to do and he would bring me most of the money. Sometimes he would give it all to me. And he was real good about helping me. I never had no trouble out of him and when I had surgery, he stayed with me all the time. He cooked and waited on me and saw that I got my medicine. He was a good child and I don't know why he got into this. I reckon because he was with the wrong person, 'cause I never had no trouble out of him before. (Witness sobs). [Emphasis added].
The State cross-examined Mrs. Lewis on that response, and she reiterated the appellant had been into different little *745 things a good while ago. The prosecuting attorney asked what little things she was talking about that he had been involved in, and she said he had gotten into something and he was released to his parents three or four times. She was interrogated in detail about those several times, but nothing was indicated as to what the matters involved or how they were disposed of in the Youth Court. Appellant contends that the Youth Court Act prohibits use of an adjudication of the Youth Court for impeachment purposes in any court. The contention is correct, except that the right of a defendant or prosecutor in criminal proceedings is preserved to show bias or interest. Here, no reference was made to Youth Court proceedings or action, and no attempt was made to introduce any adjudication order. Also, the questions asked were proper to test the recollection of the witness and was in rebuttal. Allison v. State, 274 So.2d 678 (Miss. 1973); Kearney v. State, 68 Miss. 233, 8 So. 292 (1890).

VII.

Did the lower court err in failing to rule on the admissibility of appellant's letter to Alfonso Artis in a proper and timely fashion?
While appellant and Artis were incarcerated before trial, appellant wrote Artis that, if he (Artis) continued to cooperate with the police, appellant would "do to you the same thing I did to that man in the store... ."
During cross-examination of appellant's mother, the State introduced the letter as a handwriting specimen. It was marked for identification but not admitted into evidence. After Mrs. Lewis completed her testimony, the appellant moved to suppress the letter, or, that the trial judge rule on its admissibility, if it were offered in evidence later during the trial. The judge declined to make an advance ruling. Appellant testified and, on cross-examination, the State confronted him with the letter and the trial court admitted it in evidence.
We do not think the judge was required to make an advance ruling and that such refusal was not error.

VIII.

Did the lower court err in refusing Jury Instructions D-3, D-4 and D-8?
Instruction D-3 follows:
I have previously read to you the list of aggravating circumstances which the law permits you to consider if you find that any of them is established by the evidence. These are the only aggravating circumstances you may consider. You are not allowed to take account of any other facts or circumstances as the basis for deciding that the death penalty would be an appropriate punishment in this case.
Instruction 7 (S-1) granted by the court instructed the jury that it must find the existence of certain statutory aggravating circumstances beyond a reasonable doubt prior to any consideration of the death penalty. It further limited the statutory aggravating circumstances to those four (4) on which evidence had been adduced during the trial.
Instruction D-4:
The Court instructs the Jury that the terms heinous, atrocious, and cruel are deemed to include those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies in that it involved the conscienceless or pitiless crime which is unnecessarily torturous to the victim. If you find from the evidence that the victim died a quick death without unnecessary pain and torture, then, though the crime is murder, it is not to be considered as especially heinous, atrocious or cruel.
In our opinion, under the facts of the case sub judice and under the Mississippi statute, Instruction D-4 was too restrictive and its refusal does not constitute reversible error notwithstanding Godfrey v. Georgia. Further, the discussion under Part III hereinabove applies on this question.
Instruction D-8:

*746 The Court instructs the Jury that even if you find that aggravating circumstances outweigh the mitigating circumstances, you may still recommend mercy and sentence the Defendant to life imprisonment.
The sense of that instruction was submitted in Instructions D-1 and D-7.
Instruction D-1
* * * * * *
You are instructed that even if you find the existence of one, two, three or more aggravating circumstances, you still can conclude that the circumstances are insufficient to warrant death, and you may impose a sentence of life imprisonment.
Instruction D-7
The Court instructs the Jury that you are not required to find any mitigating circumstance in order to make a recommendation of mercy that is binding on the trial Court, but you must find a statutory aggravating circumstance before recommending a sentence of death.

IX.

Did the lower court correctly grant State's Instruction No. 7 (S-1)?
The mentioned instruction sets out the four statutory aggravating circumstances relied upon by the State. Appellant claims that the evidence did not show the homicide to be heinous, atrocious and cruel, nor did it properly establish that he was under sentence of imprisonment at the time the crime was committed.
These questions have been previously discussed hereinabove and lack merit.

X.

Did the lower court err in overruling objections to parts of the closing argument of the prosecution?
In the defense attorney's argument, Honorable James Bell made the following statement:
Keep in mind this. That there is a co-defendant here who received what amounts to a five-year sentence and ask yourself is it fair if the man wasn't holding the gun. He said that they talked about killing the man the day before. Ask yourself is it fair for him to get five years and Connie Ray Evans get death.
The district attorney, in answer, made the following statement: "You can sentence the defendant to life imprisonment but that's your sentence ... that's just your sentence, ... ."
The appellant argues that the statement by the district attorney was an insinuation that, if the jury fixed the sentence at life, appellant would not serve life in the penitentiary. In our opinion, the argument of the district attorney may be interpreted in whatever manner the hearer wishes to interpret same. It does not say what appellant's counsel interprets it to say. If the argument was improper, then it could be said that the appellant's attorney provoked the comment in response to his argument.
We are of the opinion that the district attorney's statement does not constitute prejudicial or reversible error.

APPELLATE REVIEW OF SENTENCE
In accordance with Section 99-19-105(3)(a), (b), (c) ... (5), and the decisions of this Court and the Federal courts on imposition of the death penalty, we have carefully reviewed the record in this case and have compared it and the death sentence imposed in the cases which have been decided by this Court since Jackson v. State, 337 So.2d 1242 (Miss. 1976). Those cases consist of fourteen (14) decisions by this Court from Bell v. State, 360 So.2d 1206 (Miss. 1978), to King v. State, 421 So.2d 1009, No. 53,027, decided October 27, 1982, in which the death penalty was upheld.[4] In Coleman v. State, 378 So.2d 640 (Miss. 1979) the case was reversed as to punishment *747 and remanded for resentencing to life imprisonment.
In our opinion, after such review and comparison, the punishment of death is not too great when the aggravating and mitigating circumstances are weighed against each other and the death penalty will not be wantonly or freakishly imposed here.
We also find and conclude that the sentence of death was not imposed under the influence of passion, prejudice or any other arbitrary factor. The evidence in the case overwhelmingly supports the jury's finding of at least one statutory aggravating circumstance, viz: (1) the capital offense was committed by appellant while under sentence of imprisonment; (2) the capital offense was committed while the defendant was engaged in committing a robbery, (3) the capital offense was committed for the purpose of avoiding a lawful arrest, and (4) the capital offense was especially heinous, atrocious or cruel.
After comparison of the present case to those enumerated herein, we find that the sentence of death is not excessive or disproportionate to the penalty imposed in those cases, considering both the crime and the manner in which it was committed and the defendant. We also are of the opinion that the death penalty imposed on Evans is consistent and even-handed to like and similar cases and the sentencing phase followed in this trial provided a meaningful basis for distinguishing the few cases in which the death penalty is imposed from the many cases in which it is not imposed.[5]
The judgment of the lower court is affirmed, and Wednesday, December 1, 1982, is set for the date of execution of the sentence and infliction of the death penalty in the manner provided by law.
AFFIRMED AND WEDNESDAY, DECEMBER 1, 1982, SET FOR EXECUTION OF THE DEATH PENALTY.
PATTERSON, C.J., SUGG and WALKER, P.JJ., and BROOM, BOWLING, HAWKINS, DAN M. LEE and PRATHER, JJ., concur.
NOTES
[1] All trial judges should study the opinions in Godfrey and Jordan before submitting the aggravating circumstances in § 99-19-101(5)(h) to the jury.
[2] Decided before enactment of Mississippi Code Annotated § 99-19-101 (Supp. 1977).
[3] The appellant's mother testified in his behalf. While on the witness stand, she sobbed, cried and was as emotional, or more so, than Dr. Pahwa.
[4] A list of the cases is attached as Appendix A in King v. State.
[5] Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).